State ex rel. Beach v. Board of Loan Commrs., 19 N. M. 266.

(No. 1625, June 10, 1914)

STATE ex rel. ISAAC B. BEACH, Appellee, vs. BOARD OF LOAN COMMISSIONERS of the State of New Mexico.

### SYLLABUS BY THE COURT.

1. Claims for the payment of wild animal bounty from counties are not such debts and liabilities of counties as were contemplated to be assumed and paid by the state by the Enabling Act, under which the state was admitted into the Union, or by Section 1 of Article IX, and Section 3 of Article XXI of the State Constitution, or by Chapter 16, of the Laws of 1912.

P. 272

2. Chapter 16, Laws 1912, authorized the refunding and payment by the State of only such debts and liabilities of the respective counties as are evidenced by bonds or obligations of like nature.

P. 277

Appeal from District Court, Santa Fe County; Edmund C. Abbott, Presiding Judge. Reversed and Remanded.

IRA L. GRIMSHAW, for appellant.

Claim of appellee is not a valid and legal debt or liability, evidenced by bonds, coupons and other obligations. The Enabling Act, Sec. 2; Art 21, Sec. 3 of the Constitution; 27 Enc. L., p. 6; 36 Cyc., pp. 1119, 1120; Chap. 16, L. 1912.

W. E. KELLEY, for Appellee.
State and County Municipal Indebtedness. Sec. 1, Art. 9 of the Constitution; Sec. 3, Art. 26, Constitution; Sec. 16, Art. 4, Constitution; Sec. 1, Chap. 16, L. 1912; 2 Cur. L., p. 1726, Notes 10 and 11; 205 Ill. 464; 46 S. E. 222; 2 Cur. L., p. 1727; 204 Pa., p. 300.
Context and Relating Clauses. 36 Cyc. 1131, 1132; 48

Ohio St. 671; 90 S. W. 319; Black on Interpretation of Laws, p. 3; Chap. 16, L. 1912; Sec. 3, Art. 21, Compact with the U. S.

Enabling Act. 143 Fed. 793; 36 Cyc. 1130; 39 Fla. 637; 18 Fla. 557; 108 Ill. App. 612; 1 Green 325; 108 Cal. 113; 28 S. W. 936; 10 So. 96; 104 Ia. 350; 72 Ia. 386; 78 Pac. 270; 106 Cal. 113; 16 Cal. 28; Chap. 16, L. 1912.

General Terms Following Special Terms. Sutherland Stat. Constr., Sec. 279.

Obligation. 36 Cyc., pp. 1120-21-22; 143 Fed. 783; 3 Current Laws, p. 958.

## OPINION.

PARKER, J.—The plaintiff filed his claim with the Board of County Commissioners of Socorro County, for wild animal bounty, in the sum of $895.10, which was duly approved and allowed by said board and was a valid claim against said county prior to June 20, 1910. The claim was duly presented to the Board of Loan Commissioners, but said board failed and refused to take any action, either to allow or disallow the same or to issue the bonds of the state in payment of the same. Thereupon plaintiff brought mandamus and was awarded a peremptory writ by the district court of Santa Fe County, from which judgment the Board of Loan Commissioners appealed.

The sole question is one of statutory construction. The statutes involved are the Enabling Act, the Constitution of the State, and Chapter 16, Laws of 1912. The act of congress to enable the people of New Mexico to form a state government was approved June 20, 1910. Section 2 of that Act provides:

"That the debts and liabilities of said Territory of New Mexico and the debts of the counties thereof which shall be valid and subsisting at the time of the passage of this act shall be assumed and paid by said proposed State, and that said State shall, as to all such debts and liabilities, be subrogated to all the rights, including rights of in-

demnity and reimbursement, existing in favor of said Territory or of any of the several counties thereof at the time of the passage of this Act: Provided, That nothing in this Act shall be construed as validating or in any manner legalizing any territorial, county, municipal, or other bonds, obligations, or evidences of indebtedness of said Territory or the counties or municipalities thereof which now are or may be invalid or illegal at the time said proposed State is admitted, nor shall the legislature of said proposed State pass any law in any manner validating or legalizing the same."

In accordance with the terms of the Enabling Act, it is provided in Section 3 of Article 21 of the Constitution, as follows:

"The debts and liabilities of the Territory of New Mexico, and the debts of the counties thereof, which were valid and subsisting on the twentieth day of June, nineteen hundred and ten, are hereby assumed and shall be paid by this state; and this state shall, as to all such debts and liabilities, be subrogated to all the rights, including rights of indemnity and reimbursement, existing in favor of said territory or of any of the several counties thereof on said date. Nothing in this article shall be construed as validating or in any manner legalizing any territorial, county, municipal or other bonds, warrants, obligations, or evidences of indebtedness of, or claims against, said territory or any of the counties or municipalities thereof which now are or may be at the time this state is admitted, invalid and illegal; nor shall the legislature of this state pass any law in any manner validating or legalizing the same."

Section 1 of Article IX of the Constitution uses the same language.

Chapter 16 of the Laws of 1912, was passed by the state legislature in pursuance of the provisions of the Enabling Act and Constitution, above set out.

The act is entitled "An act entitled an act in relation to the debts and liabilities of the territory of New Mexico and the debts of the counties thereof assumed by the state

of New Mexico under its constitution and to provide for the payment or refunding thereof by the issue and sale of the bonds of the state of New Mexico and to create and define the powers of a board of loan commissioners to carry the provisions of this act into effect, and excluding militia warrants from consideration by said board."

Section 1 of the Act creates the "Board of Loan Commissioners of the State of New Mexico."

Sections 2 and 3 of the Act refer principally to the organization and duties of the board.

Section 4 of the Act provides for the giving of notice of its organization to the State Auditor by said Board, and the State Auditor is required to thereupon certify to said board all of the debts and liabilities of the Territory of New Mexico assumed by the State of New Mexico, under and pursuant to the constitutional provisions heretofore set out.

Section 5 of the Act is as follows:

"Immediately upon its organization, said Board shall, by its Secretary, give notice thereof to the Board of County Commissioners of each county of New Mexico and within thirty days after the receipt of such notice the Board of County Commissioners of the several counties in New Mexico are hereby directed to and shall report to the said Board of Loan Commissioners, the indebtedness of their several counties evidenced by bonds, coupons and other obligations which was valid and subsisting on June 20, 1910, and is still outstanding and unpaid, together with the amount of all accrued and unpaid interest thereon, and shall certify and report to the said Board of Loan Commissioners the nature, form and character of the respective obligations evidencing the said indebtedness made and executed by the said counties or by the officers thereof, all judgments rendered against the said counties or any of them for the principal or interest of the said indebtedness, and also the date of issue, tenor, denomination, date of maturity, optional date of payment of all bonds and obligations, and all other facts necessary and proper to enable the said Board of Loan Commissioners to ascer-

tain the amount thereof and the extent of the liability of
the State of New Mexico by reason of its assumption of
the debts of the said counties under the provisions of the
Constitution thereof."

Section 6 of the Act authorizes the Board of Loan Com-
missioners to examine and inspect all books and records
of the Territory of New Mexico, and of the several coun-
ties thereof in relation to "the authorization, issuance, sale,
delivery and payment of the debts and liabilities of the
Territory of New Mexico and of the debts of the counties
thereof."

Section 7 of the Act provides that "persons, counties
and municipalities having any claim or demand against
the Territory of New Mexico or against any of the coun-
ties thereof in respect of debts which were valid and sub-
sisting on June 20, 1910, and so assumed by said state,
may submit the same to the State Board of Loan Com-
missioners and may produce before the said Board of Loan
Commissioners the evidences of said indebtedness."

Section 8 authorizes the Board of Loan Commissioners
to issue bonds of the state to provide for the payment
or refunding of "all debts and liabilities of the Territory
of New Mexico and the debts and liabilities of the coun-
ties thereof which were valid and subsisting on June 20,
1910, as evidenced by the bonds or obligations of said
Territory of New Mexico, or by any act of the Legislative
Assembly thereof, and the bonds and obligations of the
said counties thereof and past due and matured and un-
paid interest coupons thereof and by the unpaid, valid
and subsisting judgments recovered for past due coupons
on the said bonds and obligations."

Sections 9 to 15, inclusive, of the Act refer to the form,
date of maturity, rate of interest and issue of the said
bonds.

The remainder of the Act has no application to the
question in hand.

The Attorney General argues that the claim of plaintiff
is not of the character of claim contemplated to be paid
by the State under Chapter 16, Laws of 1912. The argu-

JANUARY TERM, A. D. 1914        271

State ex rel. Beach v. Board of Loan Commrs., 19 N. M. 266

ment is founded upon the language of the Act, as contained in Section 8, above quoted, wherein it is provided that the State shall issue its bonds in payment or refunding of "the bonds and obligations of the said counties thereof." The Attorney General invokes the rule of construction of *ejusdem generis,* and we do not understand counsel for plaintiff that this doctrine would be inapplicable if Section 8 stood alone for construction. His argument, as we understand it, is based upon the proposition that the doctrine of *ejusdem generis* is not an inflexible rule of interpretation, and it will yield where other parts of the Act show a different legislative intent which he argues is shown by the legislation in this case. His argument along this line will be more fully considered hereafter.

It would seem clear that the words, "bonds and obligations," occurring in a statute as the subject matter of payment, would be confined to obligations of the same general nature as bonds. The doctrine is too well understood to require the citation of any authority. The application of it sometimes is quite difficult, but in this case it seems to be clearly applicable. Other parts of Chapter 16, Laws of 1912, would seem to require the application of the doctrine of *ejusdem generis.* Section 5 of the Act, above quoted, requires the boards of county commissioners of the several counties to "report to said Board of Loan Commissioners the nature, form and character of the respective obligations evidencing the said indebtedness made and executed by the said counties or by the officers thereof, of judgments rendered against the said counties or any of them for principal or interest of the said indebtedness, and also the date of issue, tenor, denomination, date of maturity, optional date of payment of all bonds and obligations."

This section clearly imports that the character of the indebtedness which the state was attempting to assume, and which the Board of Loan Commissioners were authorized to pay, was an obligation the evidence of which was made and executed by the counties or the officers thereof.

. 272        SUPREME COURT OF NEW MEXICO

State ex rel. Beach v. Board of Loan Commrs., 19 N. M. 266

This clearly indicates some form of obligation in the nature of a bond. The County of Socorro never made and executed any obligation to the plaintiff. It simply approved on the minutes of its board of county commissioners his claim for wild animal bounty. To ignore these words would be to extend the Act beyond what is the evident legislative intent as expressed. The language of Section 8 itself limits the definition of the word "obligation" to obligations of the character of bonds. It is therein provided, as above seen, that the Board of Loan Commissioners are authorized to pay only such debts and liabilities of the counties thereof as are evidenced by "the bonds and obligations of the said counties thereof and past due and matured and unpaid interest coupons thereof and by the unpaid valid subsisting judgments recovered for past due coupons on the said bonds and obligations." Herein it is clearly manifested that only such obligations as are of the nature of bonds bearing coupons are to be paid by the state. Section 6 of the Act is to the same effect.

We must, therefore, conclude that the debt or obligation of the County of Socorro to the plaintiff is not of such character as was contemplated to be paid by the state under the provisions of Chapter 16, Laws of 1912.

In this connection it is to be observed that a distinction is maintained throughout this legislation between the obligations of the territory and those of the several counties. The Enabling Act provides that the "debts and liabilities" of the Territory shall be assumed and paid by the state, and provides that the "debts" of the several counties, only, shall be assumed and paid. It would appear, therefore, that some distinction between the obligations of the territory and those of the counties was intended by congress. The provision in our Enabling Act in regard to the "debts and liabilities" of the territory is common to those of the states of North Dakota, South Dakota, Montana, Washington, Utah (7 Fed. Stat. Ann. 121), and Oklahoma (Supp. Fed. Stat. Ann. 636). But the provision in regard to the assumption and payment

of the debts of the counties was, so far as we are advised, enacted for New Mexico and Arizona alone. 1 Fed. Stat. Ann. (Supp. 1912) 358, 369.

The Enabling Act, commonly known as the Hamilton Bill, originated in the House of Representatives, and was House Joint Resolution No. 18166. This bill granted three million acres of land to Arizona and New Mexico, each, for the payment of all the territorial, county and municipal indebtedness of said territory. When the bill was brought into the Senate, it was amended in several parts and, as amended, was passed by the Senate, in which amendment the House concurred. The amendment with which we are concerned was the striking out of the three million acre grant to each territory, and the insertion of one million acres to each territory for the payment of railroad aid bonds of Yavapai and Maricopa Counties in Arizona, and of Grant and Santa Fe counties in New Mexico. Senator Beveridge, after tracing the history of these bonds, and showing that they were void, but were afterwards validated by Congress, in explaining the amendment to the Senate, said:

"So, while the House bill appropriated 3,000,000 acres of land in each of the Territories to pay all indebtedness, the Senate bill appropriates 1,000,000 acres of land in each of the Territories for the payment of the particular bonds upon which Congress by its act has set its seal of approval.

"The people would not have had to pay them but for the act of Congress. As a matter of fact, in the case of the Arizona bonds the people never got any benefit whatever from the bonds that were issued, absolutely none. The road was never built. But because Congress has morally pledged the United States the Senate bill appropriates land to redeem that pledge.

"But as to all the other millions of indebtedness, we see no reason why the Nation should pay it. Many of these other bonds were unwisely issued, to say the least. Many were wisely issued, too; but even in the latter case there

274    SUPREME COURT OF NEW MEXICO

State ex rel. Beach v. Board of Loan Commrs., 19 N. M. 266

has been a curious indisposition, which has not been explained, to pay some of them.

"For example, there are the court house bonds of Santa Fe county, issued forty years ago. There is not any question at all but that the money, $40,000, for those bonds was received by the authorities. The court house was built with that money, and that court house is being used now. Everybody admits their legality; it has never been questioned.

"Yet, Mr. President, the authorities have refused to pay even the interest upon them. And when Judge Laughlin of Santa Fe, New Mexico, appeared before our committee he said—I can not turn to his statement now, but I guess everybody will remember it who heard it—that 'there is no excuse for it; they simply refused to pay them.'

"As I said, the total county and territorial indebtedness amounts to over $7,000,000 all told; something more than that. The bonds which the Senate Committee bill appropriates lands to pay for, amounts, I think, all told to about one million and one-half dollars. We think that those people should go ahead and pay their just debts. We see no reason for the Nation paying those debts; but we do provide for the Nation paying that part of those debts which Congress has morally assumed. That is the difference between the two bills in that respect."—Congressional Record, Vol. 45, pages 8226-8227, 61st Congress, 2nd Session.

No discussion of the reasons for requiring the state to assume and pay the debts of the counties has been found in the Congressional Record, other than the above.

The Hamilton Bill, as before mentioned, granted three million acres of land to each territory to pay the territorial and county debt. This bill had no requirement of the assumption of county debts, but granted three million acres "for the payment of the valid and subsisting debts of said Territory and the debts of the counties thereof which are valid and subsisting at the date of the approval of this Act and which said Territory may have assumed or

shall assume."—Congressional Record, Vol. 45, Part 1, Page 702, 61st Congress, Second Session.

It thus appears that the Senate and, necessarily, the House by its concurrence, understood the words "debts of the several counties" to refer to bonded debts and not to current obligations.

Section 3 of Article XXI ,and Section 1 of Article IX, of the Constitution, followed exactly the language of the Enabling Act and maintained the same distinction between the obligations of the territory and those of the counties.

As before seen, the legislature, in Chapter 16, Laws of 1912, evinces no disposition to depart from the Enabling Act or the Constitution by enlarging the class of obligations of counties which were to be assumed by the state, but on the other hand rather limited and defined the class of such obligations to bonds and coupons and judgments for past due interest coupons. In this we do not deem the legislature to have violated either the letter or the spirit of .the Enabling Act and Constitution.

In the first place, aside from the supposed reasons asserted in the Senate by Senator Beveridge, there can be no reason for compelling the assumption by the state of the obligations of the counties. It had never before been required of other states upon admission, so far as we are advised. The creditors of the respective counties still retain the same rights, remedies and securities against the counties after statehood as before.

There is no reason, therefore, to expand the term "debt" beyond its original legal meaning. Blackstone defines a debt as follows:

"The legal acceptation of debt is a sum of money due by certain and express agreement; as, by a bond for a determinate sum; 'a bill or note; a special bargain; or a rent reserved on a lease; where the quantity is fixed and specific, and does not depend upon any subsequent valuation to settle it." Blackstone's Commentaries, 154.

He says further, on page 158, as to implied agreements:

"Whatever therefore the laws order any one to pay that

becomes instantly a debt, which he hath beforehand contracted to discharge."

See Cyc. 393; 2 Words & Phrases, 1864, where the cases are collected, and many of which rely upon Blackstone's definition of the word debt.

In the case at bar, the statute provides for the payment by the several counties of bounties on wild animals, out of a certain fund to be raised by the levy of a tax of not to exceed one mill on the dollar, on all taxable property in the county. Chapter 104, Laws 1909. The legislation clearly imposes upon the counties the statutory duty to levy a tax and to pay wild animal bounties out of the same.

It may be that this obligation is a debt within Blackstone's definition. But the trouble with relator's case is, as we have seen heretofore, that the word "debt" as used in Chapter 16, Laws of 1912, is controlled and limited in its meaning by the very terms of that Act, and refers to bonded debts, or debts of that nature.

Another consideration, not mentioned in the briefs, is the fact that there is no unqualified obligation on the part of counties to pay wild animal bounties. They are required to levy a tax of not to exceed one mill on the taxable property of the county, but they are prohibited from paying the bounty unless the funds are available in the Wild Animal Bounty Fund. See Chap. 104, Laws 1909.

It thus appears that there is not only no contractual obligation, but no statutory obligation, on the part of counties to pay wild animal bounties, unless the fund shall have been raised by taxation, wherewith to pay the same. The amount of the levy, up to one mill, rests in the discretion of the Board of County Commissioners. This consideration alone would seem to be sufficient to defeat relator. He can maintain no action against the county upon his claim, and must wait for the collection of the money by taxation. He may have the right to compel the levy of a tax, but the county owes him no debt until it has the money to pay it.

We have carefully examined the briefs of counsel for relator. It consists of the attempted application of well known rules of statutory construction. Most of these rules have no application, we think, to this case. The argument is made that there is no subject matter to which the word "obligations" can be applied, as used in Sec. 8 of Chap. 16, Laws of 1912, unless its meaning be expanded so as to include liabilities other than bonds or debts of like character; that there are no other obligations of counties of like nature to bonds. This is a mistaken view. A single instance may be cited. Chapter 4, Section 1, Laws of 1874, compiled as Section 186, C. L. 1884, authorizes the issuance of interest-bearing warrants for the erection of court houses and jails. These would be obligations of the counties of the nature of bonds. Whether there are any such warrants still outstanding, we are not advised, but that some were issued is a matter of the common history of the Territory. There may be other obligations of the counties of this nature still outstanding, and, if so, they are what the legislature intended by the use of the word "obligations."

It follows from what has been said that the claim of relator is not of the character contemplated by the Act of 1912, and the judgment of the District Court will be reversed, and the cause remanded with instructions to discharge the writ of mandamus, and dismiss the case, and, it is so ordered.

(No. 1625, July 29, 1914)

STATE ex. rel. ISAAC B. BEACH, Appellee, vs. BOARD OF LOAN COMMISSIONERS OF THE STATE OF NEW MEXICO, Appellant.

Appeal from District Court, Socorro County.

### ON MOTION FOR REHEARING.

PARKER, J.—Counsel for relator calls the court's attention to the fact that the claims for wild animal bounty preferred by relator against the County of Socorro and al-

lowed by the Board of County Commissioners of that county, were filed under the provisions of Chapter 77, Laws of 1905, instead of Chapter 104, Laws of 1909, as was assumed in the opinion in this case. The fact is wholly immaterial, and has no effect whatever upon the result reached by the court. Chapter 77, Laws 1905, provided for the levy of an eight-mill tax for the years 1905 and 1906, and of not to exceed four mills per annum thereafter, and contained the same proviso that the Act of 1909 contained, viz: that no application for wild animal bounty should be approved or paid unless there were funds in the wild animal bounty fund with which to pay the same.

The motion for rehearing is, otherwise than as stated above, devoted entirely to questions which were thoroughly considered in the opinion already handed down.

There is therefore, no merit in the motion and it will be denied, and it is so ordered.

### SYLLABUS BY THE COURT.

